IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

BRIAN CRAIG,

*Plaintiff,*

*v.*

TARGET CORPORATION, BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR., GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, MELANIE L. HEALEY, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, AND DMITRI L. STOCKTON,

*Defendants.*

No. 2:23-cv-________________

JURY TRIAL DEMANDED

**COMPLAINT FOR VIOLATION OF SECTIONS 10(b) AND 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULES 10b-5 AND 14a-9 PROMULGATED THEREUNDER**

## PRELIMINARY STATEMENT

1. Target Corporation —the self-proclaimed store of the "boomer mom who drives a minivan and lives in the suburbs," Susan Berfield*, Target's Future Will Be Decided by Kids*, BLOOMBERG (July 7, 2016), https://tinyurl.com/ycypw6w5—and its Board of Directors betrayed both Target's core customer base of working families and its investors by making false and misleading statements concerning Target's Environmental, Social and Governance (ESG) and Diversity, Equity, and Inclusion (DEI) mandates that led to its disastrous 2023 children-and-family themed LGBT-Pride campaign.

2. These false and misleading statements caused Target's shareholders to unknowingly support Target's Board and management in their misuse of investor funds to serve its divisive political and social goals—and ultimately lose billions.

3. The Defendants, Target and members of its Board of Directors ("Board"), have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by causing Target to issue proxy statements that falsely and misleadingly stated that Target's Board and its committees (i) oversaw social and political issues and risks arising from Target's pursuit of ESG and DEI mandates, (ii) adopted Target's ESG and DEI mandates in order to advance shareholders' pecuniary interests in the value of Target's stock, and (iii) proposed executive compensation plans that were aligned with shareholders' pecuniary interests in the value of Target's stock.

4. Target portrays itself as the store of working families. Berfield, *supra*. But as Target's formerly loyal customer base now recognizes, Target's Board and management for years spent Target's valuable financial and reputational capital on the pursuit of ESG and DEI mandates behind the facade of Target's classic middle-class brand—all the while falsely and misleadingly portraying the risks of its strategy to Target's shareholders in order to secure its re-election and insulate itself from accountability.

5. The bill came due in May 2023, when Target faced an unprecedented customer backlash to a campaign Target undertook as a result of its ESG and DEI initiatives—Target's now infamous children-and-family-themed LGBT-"Pride" marketing and sales campaign—which embroiled Target in the culture war and caused Target to experience the biggest stock decline in the company's history, costing investors billions.

6. The Defendants' misconduct began when, after Defendant Brian C. Cornell took over as Chairman of Target's Board ("Chairman") and Chief Executive Officer ("CEO") in 2014, Target adopted several ESG and DEI mandates that materially affected Target's corporate strategy and business performance.

7. Target was an early adopter of corporate LGBT initiatives, publishing a "Pride Manifesto" in 2015, *#TakePride With Target,* TARGET (June 8, 2015), https://tinyurl.com/4y772d85; *Target's Pride Manifesto Video Transcript*, TARGET (June 8, 2015), https://tinyurl.com/2p8aymuh; and no longer "labeling toys for boys or for girls." Rebecca Hains, *Target Will Stop Labeling Toys for Boys or for Girls. Good.*, WASH.

POST (Aug. 13, 2015), https://tinyurl.com/5n8drvy5; *What's in Store: Moving Away from Gender-based Signs,* TARGET (Aug. 7, 2015), https://tinyurl.com/yx7z3sd3.

8. A year later Target became "the central battleground of a vitriolic national debate over transgender rights" after Target published an antagonistic response to North Carolina's transgender bathroom law. Hayley Peterson, *The Target Boycott is Spiraling Out of Control*, BUS. INSIDER (Apr. 26, 2016), https://tinyurl.com/2s4xhz7v; Rachel Abrams, *Target Steps Out in Front of Bathroom Choice Debate*, N.Y. TIMES (Apr. 27, 2016), https://tinyurl.com/2vhfnc39.

9. Target also adopted "supplier diversity" targets, including for a majority of certain collections to be made by "LGBTQIA+ creators and brands." 2022 Target ESG Report at 45, 51, https://tinyurl.com/2p9e84rk.

10. In 2020, Target committed to an expressly race-based hiring plan by pledging to "increase representation of Black team members across the Company by 20 percent" over three years through changes to its advancement, retention, and hiring plans. Press Release, *Target Releases Workforce Diversity Report; Plans to Increase Representation of Black Team Members Across the Company by 20 Percent*, TARGET (Sept. 10, 2020), https://tinyurl.com/42p6uxxf.

11. Target also launched an ESG and DEI-themed initiative called "Target Forward" that, among other mandates, committed Target to work toward ensuring that "100% of suppliers [] have policies and programs to advance gender equity." *Target Forward: Our Sustainability Strategy*, TARGET, https://tinyurl.com/td7rd42k (last accessed Aug. 3, 2023).

12. Target experienced customer and investor backlash to some of these initiatives.

13. For example, after Target's outspoken opposition to the North Carolina transgender bathroom law, several boycotts of Target were organized, *see* Phil Wahba, *Nearly 1 Million Sign Pledge to Boycott Target Over Bathroom Policy*, FORTUNE (Apr. 28, 2016), https://tinyurl.com/msfjn85s, which "cost the company millions in lost sales and added expenses" after "[s]hopper traffic and same-store sales started sliding for the first time in years . . . and the company was forced to spend $20 million installing single-occupancy bathrooms in all its stores to give critics of the policy more privacy." Hayley Peterson, *The Target Boycott Cost More Than Anyone Expected — and the CEO Was Blindsided*, BUS. INSIDER (Apr. 6, 2017), https://tinyurl.com/bdh99pj5.

14. In December 2021, a Target shareholder sought an external audit of Target's "overtly and implicitly discriminatory employee-training and other employment and advancement programs." Letter from Scott Shepard to Target Corp. (Dec. 17, 2021), https://tinyurl.com/y3e5smxp.

15. In Target's 2022 and 2023 Annual Proxy Statements, the Board assured the Plaintiff and other investors that it was monitoring for social and political risks created by the ESG and DEI mandates that the Board and Target management had imposed on the company. In reality, the Board, both itself and through the applicable Board committees, only acknowledged risks it perceived from *failing to achieve its self-imposed ESG and DEI mandates*. These "risks" were definably *not* "social or political" risks of ESG and DEI mandates—neither according to Target's definition nor by how

a reasonable investor would understand the phrase's meaning—but instead were "risks" driven by a select group of nonprofit-organization "stakeholders" that Target worked with directly to adopt those very ESG and DEI mandates. These "stakeholder"-driven "risks" were a pretext for Target to adopt ESG and DEI mandates, not a good-faith oversight of the social and political risks of adopting ESG and DEI corporate policies.

16. Even if these "stakeholder"-driven risks could be defined as "social and political" risks to ESG and DEI mandates, the Board still misrepresented its oversight because the Board monitored only one side—i.e., whether it would face backlash from having *too little* ESG and DEI, and not whether its divisive ESG and DEI mandates would create social and political risk, such as customer backlash.

17. Defendants knew their ESG and DEI mandates were a double-edged sword that risked backlash. After all, Target itself experienced significant backlash from its customers after Target became the face of corporate opposition to North Carolina's transgender bathroom law in 2016. Defendants knew companies like Walt Disney and Anheuser-Busch experienced immense backlash to similar LGBT initiatives. Defendants knew that peer companies included the risk of backlash in their oversight of the social and political risks to their ESG and DEI mandates.

18. The 2022 and 2023 Annual Proxy Statements similarly misrepresented that Target adopted ESG and DEI mandates to advance shareholder value when, in reality, Target adopted and pursued ESG and DEI mandates for the collateral interests

of Defendants and Target officers who had disabling conflicts of interest that prevented them from seeking the best interests of Target shareholders.

19. The 2022 and 2023 Annual Proxy Statements also misled investors by stating that Target's proposed executive compensation plans were aligned with shareholder value when, in reality, they included substantial incentive payments to executives for meeting ambiguous and subjective "DEI progress" mandates.

20. Relying on these proxy statements, Target shareholders re-elected Target's Board, turned down multiple proposals via shareholder vote to reform the Board's risk oversight functions at Target's 2022 and 2023 annual meetings, and approved executive compensation plans that incentivized Target's officers to implement DEI programs.

21. Unbeknownst to investors, the Target Board's and management's years of failing to oversee the risks of its adoption of ESG and DEI mandates (and misleading investors both as to that failure and to the risks of those mandates) had made Target a house built on sand—liable to catastrophe. As a result of its aggressive ESG and DEI programs unchecked by Board oversight, Target developed an LGBT-"Pride" marketing and sales campaign aimed at families, young adults, and young children, sparing no one, not even toddlers.

22. No rational board of directors or management of a retailer with a core customer base of working families would have approved such a nationwide campaign; nonetheless, Target's officials pursued it.

23. The rain and the floods came in May 2023, when loyal Target shoppers discovered in the aisles products like:

- "LGBT Pride: Kids' Clothing," modeled by very young children with rainbow Mickey Mouse symbols, *see LGBT Pride: Kids Clothing*, TARGET, https://tinyurl.com/2rpxw8ec (last accessed Aug. 3, 2023);
- "T-shirts that say 'Pride Adult Drag Queen "Katya,"' 'Trans people will always exist!' and 'Girls Gays Theys,'" Shannon Thaler, *Target's Reputation Takes Hit over Children's LGBTQ Clothing, Survey Shows*, N.Y. POST (May 24, 2023), https://tinyurl.com/mry5eknm;
- "[S]wimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage," Abigail Anthony, *Target Reportedly Moving 'Pride' Items to Back of Store to Avoid the Bud Light Treatment,* NAT'L REV. (May 23, 2023), https://tinyurl.com/2s3m5vva; and
- Designs produced by a "Satanist-Inspired" brand Abprallen, which is known for other designs that "glorif[y] violence" against so-called "transphobes," such as "designs showing the phrases 'We Bash Back' with a heart-shaped mace in the trans-flag colors, 'Transphobe Collector' with a skull, and 'Homophobe Headrest' with skulls beside a pastel guillotine," Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise*

*When It Partnered with LGBT Brand, Designer Claims*, NAT'L REV. (May 24, 2023), https://tinyurl.com/2dvffpfz.

24. After immense customer backlash to Target's LGBT-Pride campaign resulted in customer boycotts of Target, Target lost $10 billion in market valuation over May 18–28, 2023, due to parents' backlash over the company's LGBT-themed clothing line for children, its "longest losing streak in 23 years." Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing*, N.Y. POST (May 28, 2023), https://tinyurl.com/yc8r99rt. The stock value remains depressed.

25. Target shareholder Brian Craig ("Plaintiff") owns 216.450 shares of Target stock, which he purchased on and has continuously owned since April 11, 2022. In the time since, he has suffered damages from the decline in Target's stock. Plaintiff purchased his stock for $49,999.95. As of May 17, 2023, prior to customer backlash to the LGBT-Pride Campaign, his stock was valued at approximately $34,839. As of June 14, his stock was valued at $28,896.10. Plaintiff continues to own his Target stock.

26. Plaintiff makes these allegations based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Target's public documents and announcements made by Defendants, United States Securities and Exchange Commission filings, wire and press releases published by and regarding Target

Corporation, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

## PARTIES

27. Plaintiff Brian Craig is a Target shareholder and resident of this Judicial District.

28. Defendant Target is a Minnesota corporation with principal executive offices at 1000 Nicollet Mall, Minneapolis, MN, 55403-2542. Target's common stock trades in an efficient market on the New York Stock Exchange (NYSE) under the trading symbol "TGT."

29. Defendant Brian C. Cornell has served as Target's Chairman and Chief Executive Officer at all relevant times, including when Target issued its 2022 Annual Proxy Statement (the "2022 Proxy") and 2023 Annual Proxy Statement (the "2023 Proxy"). Defendant Cornell resides in Minnesota.

30. Defendant David P. Abney is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Abney resides in Georgia.

31. Defendant Douglas M. Baker, Jr. is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Baker resides in Minnesota.

32. Defendant George S. Barrett is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Barrett resides in Ohio.

33. Defendant Gail K. Boudreaux is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Boudreaux resides in Indiana.

34. Defendant Robert L. Edwards is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Edwards resides in Idaho.

35. Defendant Melanie L. Healey is a former Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Healey resides in Ohio.

36. Defendant Donald R. Knauss is a Target director and was a Target director when Target issued the 2022 Proxy and 2023 Proxy. Defendant Knauss resides in Texas.

37. Defendant Christine A. Leahy is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Leahy resides in Illinois.

38. Defendant Monica C. Lozano is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Lozano resides in California.

39. Defendant Grace Puma is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Puma resides in Florida.

40. Defendant Derica W. Rice is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Rice resides in Rhode Island.

41. Defendant Dmitri L. Stockton is a Target director and was a Target director when Target issued the 2022 Proxy and the 2023 Proxy. Defendant Stockton resides in North Carolina.

42. The foregoing defendants who are or were Target directors are hereinafter referred to as the "Director Defendants."

## JURISDICTION AND VENUE

43. The claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9), and under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

44. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

45. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Plaintiff received and reviewed the violative proxy statements in this district. Defendant Target conducts business in this Judicial District. Defendants have minimum contacts with the United States, most notably because they each reside in the United States. Defendant Target,

of which each Director Defendant was or is a director, conducts its internal affairs and business in the United States.

46. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## FACTS

### I. Target's Adoption of ESG and DEI Mandates and Ongoing Customer Backlash

47. Target's 2022 Annual Report recognizes that the company's core customer base is "families." Target Corp., 2022 Annual Report (Form 10-K) at 1 (Mar. 8, 2023), https://tinyurl.com/55nhf56n. Management recognized in bold letters the serious risk to the company's financial prospects if that core customer base were to have a negative perception of the corporation: "**Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.**" *Id.* at 8 (emphasis in original); *see also* Nathaniel Meyersohn, *How Target Is Trying to Woo Moms and Dads*, CNN BUS. (Feb. 21, 2019), https://tinyurl.com/yetr4hzn ("Parents are crucial to Target's success because they spend more every year than shoppers without children, the company says.").

48. But for years, Target has been undercutting its resiliency to that core risk by adopting divisive and extreme ESG and DEI mandates, failing to oversee the risks

of doing so, such as the risk of triggering a customer backlash, and misleading investors about both the mandates and these risks.

### A. Under Defendant Cornell as Chairman and CEO, Target Began Embracing Aggressive ESG and DEI Mandates.

49. In the years after Defendant Cornell began his tenure as Chairman and CEO as the "first outsider ever tapped to lead the company in its more than 100-year history," Allison Kaplan & Burl Gilyard, *2019 Person of the Year: Brian Cornell*, TWIN CITIES BUS. (Dec. 1, 2019), https://tinyurl.com/2bp68nea, Target began adopting increasingly aggressive and costly ESG and DEI commitments that harmed Target's ability to appeal to these customers, thereby harming investors.

50. The first example was Target's response to a law passed by the North Carolina legislature that limited bathroom access to the sex listed on one's birth certificate. Target set itself up for a disproportionate response to the law by first adopting an LGBT-"Pride Manifesto" in 2015 and unwaveringly asked its employees to espouse this belief. *#TakePride With Target,* TARGET (June 8, 2015), https://tinyurl.com/4y772d85; *Target's Pride Manifesto Video Transcript*, TARGET (June 8, 2015), https://tinyurl.com/2p8aymuh.

51. Target then "botched" its response to the North Carolina law by publishing a blog post, which was reportedly not reviewed by senior management, "welcoming transgender employees and shoppers to use restrooms and fitting rooms corresponding with their gender identities" and changing Target's signature "red bullseye logo into a gay-pride rainbow." Khadeeja Safdar, *How Target Botched Its*

*Response to the North Carolina Bathroom Law*, WALL ST. J. (Apr. 5, 2017), https://tinyurl.com/ycyddz93.

52. After massive backlash to Target's publication of the blog post, "[a]t Target's Minneapolis headquarters, executives scrambled to control the damage," which, [a]fter an internal review, executives determined . . . was the tipping point for some stores, especially in the South, that were already not inviting or competitive enough to give shoppers a reason to come back." *Id*.

53. After the incident, Defendant Cornell reportedly admitted to Target staff that "Target didn't adequately assess the risk, and the ensuing backlash was self-inflicted," but "it was too late to reverse course." *Id*.

54. Nonetheless, Defendant Cornell publicly defended the decision, stating: "We took a stance, and we're going to continue to embrace our belief of diversity and inclusion, just how important that is to our company." Travis M. Andrews, *Target CEO Responds to Nationwide Boycott of the Store Over Transgender Bathroom Policy*, WASH. POST (May 13, 2016), https://tinyurl.com/36xtbjec.

55. The cost of Target's "botched" response to the North Carolina law was steep. Target's sales fell in each quarter following the blog post and, in response, Target was forced to "spend $20 million to add private bathrooms to the stores that didn't have them" and "embark[] on a multibillion-dollar revamp" of the stores that were falling behind as a result. Safdar, *supra*.

56. Between 2016 and the present, Target donated millions to an organization called "GLSEN," which "Promotes LGBT Activism in Schools." Bill

Pan, *Target Donated Millions of Dollars to Group That Promotes LGBT Activism in Schools,* THE EPOCH TIMES (May 26, 2023), https://tinyurl.com/2mxc4tub.

57. Among other things, GLSEN's mission includes undermining parents' federal and state constitutional and statutory rights by directing public schools to withhold "any information that may reveal a student's gender identity to others, including [to] parents or guardian[s]." Hannah Grossman, *Target Partners with Org Pushing for Kids' Genders to be Secretly Changed in Schools Without Parental Consent, 'We . . . Continue to Support Their Mission,' Target Corporation Said About GLSEN,* FOX NEWS (May 26, 2023), https://tinyurl.com/28kckdjp.

58. A 2020 GLSEN guide states:

> Students may not be ready for their parents or guardians to know about their gender identity or expression, or that they are expressing their affirmed gender at school. Before contacting the parent or guardian of a transgender or nonbinary student, school staff should clarify with the student whether to use their gender affirming name and the pronouns that correspond to their gender identity, or whether to use their legal name when corresponding with a parent/guardian.

*Model Local Education Agency Policy on Transgender and Nonbinary Students*, GLSEN & NAT'L CTR. FOR TRANSGENDER EQUAL. at 5 (Oct. 2020), https://tinyurl.com/7nsw3zkn.

59. Management apparently supports this mission. By funding GLSEN, Target is subsidizing GLSEN's policy of promoting "secret gender transitions for kids." Laurel Duggan, *Major Children's Clothing Retailers Poured Money into LGBT Group That Promotes Secret Gender Transitions For Children,* DAILY CALLER (May 30, 2023),

https://tinyurl.com/2p8wf5nc. Yet fostering a sense of trust with parents is critical to the corporation's customer base and success.

60. Target's marketing senior executive Carlos Saavedra serves as treasurer at GLSEN. Hannah Grossman, *Target Marketing VP Holds Senior Position at Org Pushing Secretive Transgender Policies in K-12 Schools*, FOX NEWS (May 29, 2023), https://tinyurl.com/38yjn67v.

61. Target's Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, serves on the Board of GLSEN, *GLSEN Welcomes New Leaders to National Board of Directors*, GLSEN (June 13, 2022), https://tinyurl.com/4kz9ze9u, and has accepted an award from GLSEN on behalf of Target, @GLSEN, TWITTER (October 21, 2016, 10:49 PM), https://tinyurl.com/yc36hwbj.

62. Target has also adopted "supplier diversity" targets. In its latest report on those targets, Target stated that "59% of our Pride assortment was designed with and by LGBTQIA+ creators and brands" as part of Target's overall strategy that sources from "suppliers that are at least 51% owned, controlled and operated by women, BIPOC, LGBTQIA+, veterans or people with disabilities." 2022 Target ESG Report, *supra*, at 45, 51.

63. According to these objectives, Target's Chief Diversity & Inclusion Officer and Vice President of Human Resources, Kiera Fernandez, has stated that even if an employee "do[esn't] believe in" Target's DEI initiatives, he or she "still ha[s] to do it to be part of this company." "[Each employee] will be responsible for these behaviors, values, and expectations." Sarah Weaver, *Resurfaced Video Shows Target*

*Diversity Chief Suggesting Employees May 'Leave' If They Think Differently*, DAILY CALLER (May 30, 2023), https://tinyurl.com/ypw5zs4h.

64. Fernandez also stated during a panel appearance, in her capacity as a Target officer, that companies and diversity officers should "feel more called to push and . . . resolve to be provocative" on DEI issues in the workplace. Twin Cities Business Talks, *Diversity, Equity, and Inclusion: BIPOC Women Rise to Leadership*, YOUTUBE, at 23:18–35 (June 28, 2021), https://tinyurl.com/24zzn5xp. Fernandez then stated that "[t]he number one thing that I would encourage white women to do is take the [DEI] learnings that you've invested to better understand and use your voice so the woman of color in the room doesn't always have to be the woman that calls out transgression." *Id.* at 57:26–49.

65. Fernandez also lauded "such a strong commitment from our CEO," Defendant Cornell, to these DEI issues. *Id.* at 13:10–23.

66. In a blog post for Target, Fernandez characterized Target's DEI mandates as an "infrastructure . . . that allow[s] you to integrate DE&I into your ecosystem in a way that truly drives your business." *Target's Kiera Fernandez Shares How We're Championing Diversity, Equity, and Inclusion Outside Our Walls*, TARGET (Aug. 3, 2021), https://tinyurl.com/2e9nkyz6.

67. In a May 17, 2023 interview, Defendant Cornell described Target's DEI commitments as "the right thing for society." Fortune Editors, *Target CEO: DEI has 'fueled much of our growth over the last 9 years'*, YAHOO FIN. (May 17, 2023), https://tinyurl.com/2shnh5yu.

### B. Target's Disastrous 2023 LGBT-"Pride" Campaign

68. In 2023, Target undertook its now infamous children-and-family-themed LGBT-"Pride" campaign (the "LGBT-Pride Campaign").

69. Target engaged in the LGBT-Pride Campaign as part of its ESG and DEI commitments. *See* 2022 Target ESG Report *supra*.

70. In May 2023, Target began stocking its stores with LGBT-themed clothing targeted at children and families.

71. Target's website currently lists over 100 products under the category "LGBT Pride: Kids' Clothing," which are often modeled by very young children and almost always feature themes designed to attract and interest them, like rainbow Mickey Mouse symbols. *LGBT Pride: Kids Clothing*, TARGET, https://tinyurl.com/2rpxw8ec (last accessed Aug. 3, 2023).

72. This campaign also extended to brick-and-mortar stores. News reports state that "[t]here was plenty of LGBTQ merch in Target's children's section," and Target also stocked "T-shirts that say 'Pride Adult Drag Queen "Katya,"' 'Trans people will always exist!' and 'Girls Gays Theys.'" Shannon Thaler, *Target's Reputation Takes Hit Over Children's LGBTQ Clothing*, *supra*.

73. No child was too young for Target, which advertised and sold LGBT-themed products like onesies, bibs, and overalls aimed at newborns and toddlers.

74. Target also stocked other controversial merchandise in the LGBT-Pride Campaign, including "swimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia"

with "extra crotch coverage." Abigail Anthony, *Target Reportedly Moving 'Pride' Items, supra*. See below:




Will Potter, *Target Takes 'Emergency' Action to 'Avoid a Bud Light Situation' and Removes 'Tuck-Friendly' Women's Swimwear and LGBTQ Products from Display in Southern Stores—as CEO Defends the Line,* DAILY MAIL UK (May 23, 2023), https://tinyurl.com/ms74wm48.

75. Target also knowingly stocked merchandise by "Satanist-Inspired" brand Abprallen for its pride collection, according to its designer Erik Carnell. Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise*, *supra*.

76. Abprallen is known for designs that "glorif[y] violence" against so-called transphobes, such as "designs showing the phrases 'We Bash Back' with a heart-shaped mace in the trans-flag colors, 'Transphobe Collector' with a skull, and 'Homophobe Headrest' with skulls beside a pastel guillotine." Abigail Anthony, *Target Partners with Satanist Brand to Create Items for 'PRIDE' Collection,* NAT'L REV. (May 22, 2023), https://tinyurl.com/bdsbf9c9. See below:




*Homophobe Headrest,* ABPRALLEN, https://tinyurl.com/bddmh3yy (last accessed Aug. 3, 2023).

77. Abprallen's other designs also include divisive imagery, including "pentagrams, horned skulls and other Satanic products," Siddharth Cavale, *Target Removing Some LGBTQ Merchandise Following Customer Backlash*, REUTERS (May 24, 2023), https://tinyurl.com/y7j8hvcw, and one design "featuring the slogan 'Satan Respects Pronouns' and a horned ram representing Baphomet—a half-human, half-animal deity that is both male and female." Helen Reid, *Target Pride Backlash Exposes 'Rainbow Capitalism' Problem, Designer Says*, REUTERS (May 31, 2023), https://tinyurl.com/35b9wxw2. See below:




Abprallen (@abprallenuk), INSTAGRAM (May 29, 2023), https://tinyurl.com/5ef2c9p7.

78. According to an Instagram post by Carnell, Target "was fully aware of the brand's Satanist-inspired merchandise." Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise, supra*. In the post, Carnell wrote:

> When I was approached to create products for Target they told me that my work such as 'Satan Respects Pronouns' wouldn't be a good fit, they were observant enough and had the necessary critical thinking skills to realise [sic] that my use of occult imagery is as harmless as any horror movie targeted towards adults but wanted my collection for adults to be a bit less gothic.

79. According to Carnell, the Abprallen designs Target sold included a fanny pack with the statement "We Belong Everywhere," a tote that says "Too Queer For Here" and a sweatshirt that says "Cure Transphobia, Not Trans People." BrieAnna J. Frank, *British Brand, not Target, sells 'Satan respects pronouns' shirt: Fact Check*, USA TODAY (May 25, 2023), https://tinyurl.com/bdhwcnee.

***Financial and Reputational Harm & Regulatory Scrutiny***

80. During the period of Plaintiff's ownership of Target stock, Target's stock price reached as high as $241.68.

81. Prior to the revelation of the LGBT-Pride Campaign, Target's stock was priced at $160.96 on May 17, 2023.

82. News reports state that Target lost $10 billion in market valuation over May 18–28, 2023 due to parents' backlash over the company's LGBT-themed clothing line for children. Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing*, N.Y. POST (May 28, 2023), https://tinyurl.com/yc8r99rt. Target's stock value remains depressed.

83. Observers similarly noted that Target stock endured "its longest losing streak in 23 years," Sabrina Escobar, *Target Isn't the Only Retailer Facing Anti-Pride Backlash,* BARRON'S (June 1, 2023), https://tinyurl.com/yc6zn8bc.

84. In May, "Target's market value [fell] over $12 billion to $61.77 billion. . . . Mid-month the market value was over $74 billion." David Rutz, *Target May Have 'Lost Control of the Narrative' As Financial Losses, LGBT Anger Mount: Consumer Researchers*, FOX NEWS (May 31, 2023), https://tinyurl.com/3bn2t5cz.

85. JPMorgan recently downgraded the stock, citing recent "controversies" as part of the explanation. Matthew Fox, *JPMorgan Downgrades Target Stock Because of Its High Exposure to Millennials and the Upcoming Resumption of Student Loan Payments*, BUS. INSIDER, https://tinyurl.com/34mmfpkx.

86. This dramatic and sudden loss in company market capitalization is a direct and predictable result of management's calculated decisions to promote sexualized material to children, and the Board's lack of oversight thereof, as a means of virtue signaling to culturally extreme "stakeholders" at the expense of the corporation's core customer group of families and parents, whose reputational views are paramount, as Target itself has recognized. "We call our customers 'guests,' [and] there is outrage on their part," stated one Target insider who has worked there for nearly two decades. Brian Flood, *Target Holds 'Emergency' Meeting over LGBTQ Merchandise in Some Stores to Avoid 'Bud Light Situation*,' FOX NEWS (May 23, 2023), https://tinyurl.com/3wuz7rdj.

87. As one investment fund described, Target's stock price drop was "primarily driven by customers and public reaction to in-store promotions for the month of June." Soumya Eswaran, *Here's Why Target Corporation (TGT) Declined in Q2*, YAHOO FIN. (Aug. 2, 2023), https://tinyurl.com/mpu6vj65.

88. Management's program to alienate the corporation's core customer base by promoting sexualized products for young children has caused catastrophic reputational harm. Target "took 53rd place on the 2023 Axios Harris Poll 100 corporate reputation rankings released Tuesday — the same day the chain yanked some of its Pride merch off store shelves after the pro-LGBTQ messages caused violent outbursts among customers." Shannon Thaler, *Target's Reputation Takes Hit over Children's LGBTQ Clothing, Survey Shows*, N.Y. POST (May 24, 2023),

https://tinyurl.com/mry5eknm. "Target's 21-spot drop was the third-largest on the list." *Id*.

89. A rap song titled "Boycott Target" reached #1 on iTunes sales in the United States. Shannon Thaler, *'Boycott Target' Song over Retailer's LGBTQ 'Agenda' Tops iTunes — But Rapper Still Claims He's 'Shadow-Banned,'* N.Y. POST (May 30, 2023), https://tinyurl.com/52kevs6f. The song's video features a rapper showing sexualized merchandise aimed at children in an actual Target store while encouraging customers not to shop at Target. *See* Forgiato Blow, *Boycott Target "Official Music Video",* YOUTUBE (May 25, 2023), https://tinyurl.com/48t2kp42.

90. On May 24, 2023, management announced changes to the LGBT-Pride Campaign due to consumer backlash, including "removing [certain Pride-related] items," citing "threats impacting our team members' sense of safety and well-being while at work." Press Release, *Target Statement on 2023 Pride Collection,* TARGET (May 24, 2023), https://tinyurl.com/yns9wz9f. A Target spokeswoman reported that "people have confronted workers in stores, knocked down Pride merchandise displays, and put threatening posts on social media with video from inside stores." Sarah Nassauer, *Target to Pull Some LGBT-Themed Merchandise After Customer Backlash*, WALL ST. J. (May 24, 2023), https://tinyurl.com/mkyykyz4.

91. In response to these changes, Target stores in Ohio, Utah, Pennsylvania, Oklahoma, New York, New Hampshire, Vermont, and Louisiana faced numerous bomb threats from pro-LGBT extremists. Brian Flood, *Target Stores Received Bomb Threats Accusing Retailer of Betraying LGBTQ Community Amid Woke Backlash,* FOX

NEWS (June 13, 2023), https://tinyurl.com/565t3cdc. One bomb threat letter written to a Vermont store proclaimed that Target "betray[ed] the LGBTQ+ community." *Id.* Another letter to a Louisiana Target indicated the author intended to bomb Target locations because of Target's "intolerance":

> "You are pathetic cowards who bowed to the wishes of far right extremists . … We will not tolerate intolerance or indifference. If you are not with us then you are against us. That is why we placed a bomb in each of your locations."

*Id.*

92. Finally, Target's LGBT-Pride Campaign put it at the center of the culture-war spotlight, unsurprisingly bringing it under regulatory scrutiny from both ends of the political spectrum.

93. After Target announced the foregoing changes to the LGBT-Pride Campaign as a result of customer backlash, a group of fifteen state attorneys general wrote a letter to Defendant Cornell expressing their concern that Target's decision to reduce its commitment to the LGBT-themed marketing strategy might "set back the march for social progress and LGBTQIA+ equality." Letter from Andrea Joy Campbell, Attorney General of Massachusetts, and fourteen other state attorneys general to Brian C. Cornell, Chairman and CEO, Target Corp. 2 (June 16, 2023), https://tinyurl.com/29r5emzc.

94. Instead, the attorneys general "urge[d] Target to double down on inclusivity[] [and] reject hate in all its forms," and insinuated that Target's reported

changes to the marketing strategy might run afoul of public accommodation laws that "demand that customers be treated equally." *Id*. at 3.

95. On July 6, 2023, a different group of seven state attorneys general sent a letter to Mr. Cornell expressing their concern for Target's "promotion and sale of potentially harmful products to minors, related potential interference with parental authority in matters of sex and gender identity, and possible violation of fiduciary duties by the company's directors and officers." Letter from Todd Rokita, Attorney General of Indiana, and six other state attorneys general to Brian C. Cornell, Chairman and CEO, Target Corp. 1 (July 6, 2023), https://tinyurl.com/4h5yyxac.

96. The attorneys general suggested that "Target's 'Pride' campaign and financial support to organizations such as GLSEN . . . raise concerns under our States' child-protection and parental-rights laws," including laws penalizing the "sale or distribution … of obscene matter" and "material harmful to minors." *Id*. at 1, 3. In addition to expressing concerns about the campaign's lawfulness under child-protection and parental-rights laws, the attorneys general noted their states' beneficial interests as Target shareholders and indicated that "Target's directors and officers may be negligent in undertaking the 'Pride' campaign." *Id*. at 3.

## II. Control Person Allegations

97. By reason of the Director Defendants' positions with Target as directors and, with respect to Defendant Cornell, his insider position with Target as CEO, the Director Defendants and Defendant Cornell possessed the power and authority to control the contents of Target's proxy statements. The Director Defendants and

Defendant Cornell were provided with copies of Target's proxy statements and had the ability and opportunity to prevent their issuance or cause them to be corrected.

98. Because of their positions with Target, and their access to material, non-public information available to them, but not to the public, the Director Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Director Defendants are liable for the false statements pleaded herein.

### III. Defendants Caused Target to Issue Materially False and Misleading Statements in Target's 2022 and 2023 Proxy Statements.

99. Defendants violated sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder by causing Target to issue proxy statements that falsely and misleadingly stated that Target's Board and its committees oversaw social and political issues and risks.

100. In Target's 2022 and 2023 annual proxy statements, Target assured investors that the Board was monitoring for social and political issues and risks arising from the company's ESG mandates. In reality, the Board, both itself and through the applicable Board committees, oversaw only the risks Target perceived from *failing to achieve Target's ESG and DEI mandates*.

101. These risks are definably *not* social or political risks—according both to Target's definition and how a reasonable investor would understand the meaning of social and political risks.

102. Even if they were social and political risks, the Board misrepresented its oversight because it monitored only one side—i.e., whether it would face backlash from *too little* ESG and DEI, and not whether it would incur backlash from its customers because of its divisive and extreme ESG and DEI mandates.

103. On May 1, 2023, Defendants caused Target to issue the 2023 Proxy in connection with the 2023 annual stockholder meeting to be held on June 14, 2023. *See* 2023 Proxy, https://tinyurl.com/2x869es4. In the 2023 Proxy, Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, (ii) approve executive compensation, and (iii) defeat a shareholder proposal to separate the positions of Chief Executive Officer and Chairman of the Board of Directors and require that, whenever possible, an independent director hold the position of Chairman. With respect to each of these solicitations, Target and the Director Defendants issued materially false or misleading statements.

104. The 2023 Proxy described the Board's key role in risk oversight:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.
>
> **The Board and its Committees**
>
> The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of

> our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

2023 Proxy at 14.

105. The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight and described the allocation of oversight of those matters throughout the Board and its committees:

> **Sustainability & ESG**
>
> We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:
>
> **Board**
>
> - Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
> - Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)
> - Reputation management
> - Crisis management and response
>
> ***
>
> **Audit & Risk Committee**
>
> - Supply chain ESG matters, including vendor human capital and responsible sourcing practices

> ***
>
> **Governance & Sustainability Committee**
>
> - Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)
>
> ***
>
> - Social and political issues and risks not allocated to other Committees
> - Philanthropy and community engagement
> - Policies and practices regarding public policy advocacy and political activities

2023 Proxy at 15–16. While the 2023 Proxy was clear that each of the Board, the Audit & Risk Committee, and the Governance & Sustainability Committee were responsible for oversight of various "ESG matters," only the Governance & Sustainability was described as overseeing "social" or "political" issues and risks. *Id.* at 12–16.

106. In discussing the Board Committees' roles in "fulfilling the oversight and other responsibilities delegated by the Board," the 2023 Proxy also referenced Target's "Board Committee Charters" and directed shareholders to "current cop[ies]" of such charters "available on Target's website." 2023 Proxy at 12, 78.

107. The Board's Governance & Sustainability Committee Charter further described the Committee's ESG and political and social risk oversight responsibilities:

> **<u>ESG & Corporate Responsibility Matters.</u>** Oversee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters, including:
>
> ***

- identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;

***

- *social and political issues and risks impacting the Corporation* (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);
- the Corporation's philanthropy and community engagement activities;
- external reporting on ESG and corporate responsibility matters

**Public Advocacy and Political Activities.** Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

Target Governance & Sustainability Committee Charter at 2–3 (emphasis added), *available at* https://bit.ly/3MU4lCs.

108. As described therein, the Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" was distinct from its other responsibilities, including its oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even "public advocacy and political activities." *Id.*

109. The 2023 Proxy also described the allocation of "ESG matters"-oversight to Target's management, including to "instill ESG-related priorities into our business operations":

> At the management level, our ESG matters are led and coordinated by our Senior Vice President, Corporate Responsibility, who reports to a member of our Leadership Team and regularly engages with the Governance & Sustainability Committee and the full Board. The Senior Vice President, Corporate Responsibility is responsible for:
>
> - conducting regular priority assessments to determine the topics of most significance to our stakeholders;
> - collaborating with our Leadership Team to instill ESG-related priorities into our business operations, including product design and development, sourcing and supply chain operations, human capital management, and our new store development; and
> - developing ESG-related goals and managing our ESG data, measurement, and reporting.

2023 Proxy at 16.

110. On April 25, 2022, the Director Defendants caused Target to issue the 2022 Proxy in connection with the 2022 annual stockholder meeting to be held on June 8, 2022. *See* 2022 Proxy, https://tinyurl.com/yukm87zw. The 2022 Proxy was substantially identical to the 2023 Proxy in the above-quoted language. *See* 2022 Proxy at 12–16, 75.

111. In language substantially identical to the 2023 Proxy, the 2022 Proxy described the Governance & Sustainability Committee's oversight as follows:

> **Governance & Sustainability Committee**
>
> - Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)
>
> ***
>
> - Social and political issues and risks not allocated to other Committees
> - Philanthropy and community engagement
> - Policies and practices regarding public policy and political activities

2022 Proxy at 16.

112. The foregoing statements were materially false and misleading and omitted material adverse facts about Target's business, operations, and risk management policies. Specifically, the 2022 Proxy and 2023 Proxy each falsely and misleadingly stated that the Board (i) oversaw social and political issues and risks arising from its adoption of ESG mandates, (ii) adopted ESG and DEI mandates as a means of increasing shareholder returns, and (iii) Target's executive compensation plans aligned executives' incentives with maximizing shareholder value.

## A. The 2022 and 2023 Proxy Statements Misleadingly Stated that Target's Board Oversaw Social and Political Issues and Risks.

### 1. The Board's and the Governance & Sustainability Committee's oversight of Target's engagement with "stakeholders" in pursuit of ESG goals was not oversight of "social and political issues and risks."

113. The 2023 Proxy's statement that the Board's Governance & Sustainability Committee oversaw the "social and political issues and risks" of ESG matters was materially false and misleading. The Governance & Sustainability Committee did not oversee social and political issues and risks arising from Target's pursuit of ESG mandates. Instead, the Board and the Committee oversaw Target's engagement with "stakeholders" to better achieve Target's ESG mandates—regardless of social or political issues or risks created or enhanced by Target's pursuit of those ESG mandates.

114. The Board's Governance & Sustainability Committee was established in September 2021 as part of the Board's overhaul of its committee structure. 2022 Target ESG Report, *supra*, at 56.

115. In its 2022 ESG Report, Target explained that the Board's "revised structure and charters for the committees were guided by . . . external trends in corporate governance" and stated: "[W]e believe the changes appropriately reflect how companies are adjusting to current expectations of Board oversight of ESG matters." *Id*.

116. The Governance & Sustainability Committee was preceded by the Governance Committee. *See* 2022 Proxy at 63 (describing the position of Governance & Sustainability Committee as "formerly Governance Committee Chair"); *id.* at 75 (erroneously referring to the nomination of director candidates to the Governance & Sustainability Committee as the "Governance Committee").

117. With respect to oversight of Target's ESG mandates, the Governance Committee "[a]ddresse[d] ESG topics on a consolidated basis by allocating responsibilities for ESG topics among the Board and its Committees . . . and overseeing our overall approach to corporate responsibility." Target Corp., 2021 Proxy Statement and Notice of Annual Meeting of Shareholders (the "2021 Proxy") at 18 (June 9, 2021), https://tinyurl.com/yukm87zw.

118. The Governance Committee also oversaw management's responsibility to "instill ESG-related priorities into our business operations, including product design and development" and other business tasks. 2021 Proxy at 18.

119. According to the Governance Committee's charter, the Governance Committee's oversight responsibilities did not include any oversight of "risk." Target Corp., Governance Committee Charter, https://tinyurl.com/4c394dk4.

120. Target's previous proxy statements did not mention "risk" in the Governance Committee's ESG-oversight responsibilities. *See, e.g.*, 2021 Proxy at 18.

121. The Board's 2021 overhaul of its committee structure eliminated the Governance Committee and established the "Governance & Sustainability" Committee.

122. The Governance & Sustainability Committee retained many of the previous Governance Committee's responsibilities, including to "[o]versee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters." Governance & Sustainability Committee Charter at 2.

123. With the Board's 2021 committee-structure overhaul, the Governance & Sustainability was allocated the new responsibility to "oversee . . . *social and political issues and risks*" of Target's "ESG & Corporate Responsibility Matters." Governance & Sustainability Charter, *supra*, at 2–3 (emphasis added).

124. Both the 2022 Proxy and the 2023 Proxy highlighted the Governance & Sustainability Committee's new ESG oversight responsibility for social and political issues and risks.

125. Target touted the Board's new committee structure as a way for the Board to "enhance its approach to oversight of risk and ESG matters by reallocating to its

committees oversight responsibility" for ESG and DEI matters. 2022 Target ESG Report at 56.

126. To a reasonable investor, the phrase "social and political issues and risks" means issues and risks to the company that relate to current social and political issues and arise from outside actors, usually popular cultural movements, political campaigns, or governments. *See, e.g.*, James Chen, *Political Risk*, INVESTOPEDIA (Mar. 24, 2020), https://tinyurl.com/cp4zyc5s ("Political risk is the risk an investment's returns could suffer as a result of political changes"); Robert Ludke, *Understanding and Mitigating Social Risk*, RISK MGMT. (Apr. 1, 2021), https://tinyurl.com/c5esaz3a ("[S]ocial risk . . . can be defined as the exposure to adverse consequences stemming from population-based activities and negative public perception."); David F. Larcker & Brian Tayan, *Blindsided By Social Risk: How Do Companies Survive a Storm of Their Own Making?*, ROCK CTR. FOR CORP. GOVERNANCE AT STAN. U. at 1 & n.1 (July 21, 2020), *available at* https://tinyurl.com/5cxr8wwj ("Social risk . . . describes events that impair a company's social capital," which includes "the goodwill or positive perception of a company among its stakeholders that contributes economic value through dimensions such as purchase intent by customers.").

127. In public companies' proxy statements, companies regularly define their boards' oversight of social and political issues and risks to include a broad base of material risks, including "social, political, reputational, and security risk," Kosmos Energy Ltd., 2016 Definitive Proxy Statement (Apr. 29, 2016), https://tinyurl.com/mvvt5ffm, "public perception," *see* The Williams Companies,

Inc., 2022 Definitive Proxy Statement (Mar. 17, 2022), https://tinyurl.com/382x66zv, and specific public policies that affect the company, *see* Equity Residential, 2022 Definitive Proxy Statement (Apr. 18, 2022), https://tinyurl.com/36d563b5 (discussing "key political issues for the Company, such as Section 1031 exchange rules, rental relief payments, eviction moratoriums and rent control measures"). *See also* Brody Mullins, *Government Posing Greater Risk to Corporate Profits, Chamber Study Finds*, WALL ST. J. (Apr. 11, 2023), https://tinyurl.com/2s3nyprn (citing 327,357 instances in which companies in the S&P 500 "mention[ed] political risks in annual reports" in 2021).

128. An increasingly relevant social and political risk that companies manage is the risk of social and political backlash to their pursuit of ESG and DEI mandates.

129. As companies have increasingly adopted ESG and DEI mandates to serve various stakeholders and undertaken business strategies to achieve them, they have also often experienced backlash from their customers.

130. As a result, companies that have committed to ESG and DEI-related mandates often state that political and social risks include the risk of backlash to their pursuit of ESG and DEI mandates. *See* Andrew Ramonas, *Citi, Valero, ADT Flag New Investment Risk: the Anti-ESG Effect*, BLOOMBERG L. (Mar. 15, 2023), https://tinyurl.com/mhnfw9ca; Emma Williams, *What Are the Risks of Social Washing?*, MORNINGSTAR (Aug. 19, 2022) https://tinyurl.com/bdh75kbm (stating that adopting ESG goals "[i]nevitably [] means alienating certain groups while

appeasing others" and "lead to backlash from both sides of a debate" that can "result in social risks being poorly managed or even elevated").

131. For example, ADT Inc.'s 2022 Form 10-K described risks related to its ESG initiatives even-handedly. First, the company described the risks it faced from failing to achieve its ESG goals:

> If we are unable to provide sufficient disclosure about our ESG practices, or if we fail to establish and achieve the objectives of our ESG program, which could include targets or commitments, consistent with investor, customer, employee, or other stakeholder expectations, we may not be viewed as an attractive investment, service provider, workplace, or business, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

ADT Inc., Annual Report (Form 10-K) at 47 (Feb. 28, 2023), https://tinyurl.com/4h36vhmz. Then, the company immediately followed this description with a description of risks on the other side, that is, risks arising from the company's pursuit of ESG goals in the first place:

> In addition, there exists certain "anti-ESG" sentiment among some individuals and government institutions. As we continue to establish our ESG related initiatives, we could face a negative reaction or legislation that impedes our activities or reflects poorly upon the Company, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*Id.*

132. In its 2022 Form 10-K, State Street Corp., which has adopted a variety of ESG and DEI mandates, similarly described risks related to "political issues" as arising from a backlash to ESG practices:

> Views on ESG practices . . . have *also become political issues*, which can amplify the reputational risks associated with such allegations. . . . We

> are, therefore, subject to related risks of non-compliance with relevant legal requirements, including fines, penalties, lawsuits, regulatory sanctions, difficulties in obtaining governmental approvals, limitations on our business activities or reputational harm, any of which may be significant. . . . Moreover, aside from any governmental enforcement or litigation activity, public criticism levelled at ESG investing practices could result in reduced investor demand for ESG-related products, which could in turn negatively effect [sic] our assets under management and resulting fee revenues.

State Street Corp., 2022 Annual Report (Form 10-K) at 42–43, https://tinyurl.com/bdhf9hpb (emphasis added).

133. Other companies that have adopted ESG and DEI goals have described political issues similarly. *See, e.g.*, Citigroup, Inc., 2022 Annual Report (Form 10-K) at 44 https://tinyurl.com/57ump2hm ("Citi also faces potentially conflicting anti-ESG initiatives"); Valero Energy Corp., 2022 Annual Report (Form 10-K) at 20, https://tinyurl.com/3tksmrmy ("'anti-ESG' focused activism and investment funds[] may result in additional strains on company resources."); The Carlyle Grp., Inc., 2022 Annual Report (Form 10-K) at 68, https://tinyurl.com/3ehnk6jw ("Conversely, anti-ESG sentiment has also gained momentum").

134. Since securities filings require the disclosure of material information, the foregoing companies evidently determined that such "anti-ESG" backlash is material.

135. Other prominent examples of anti-ESG backlash are also clearly material, including the consumer backlash to Target's current LGBT-Pride campaign, and previous pro-LGBT marketing and public initiatives undertaken by Target.

136. For these and other reasons, a reasonable investor would understand the phrase "social and political issues and risks" to mean any material risks to Target arising from social or political responses to Target's business activities.

137. In the 2022 Proxy and 2023 Proxy, Target touted its extensive commitment to ESG mandates—and even broadcast the Governance & Sustainability Committee's oversight of "social and political issues and risks" under the heading "Oversight areas for ESG matters." A reasonable investor would conclude that the Committee was overseeing material risks relating to Target's adoption and implementation of ESG goals, including the risk of public backlash to Target's pursuit of ESG mandates.

138. The 2022 Proxy and 2023 Proxy clearly distinguished the Committee's oversight of "social and political issues and risks" arising from ESG matters from the Committee's other responsibilities of identifying ESG priorities and overseeing Target's "public policy activities" and "political activities." The statements' precise distinction that the Governance & Sustainability Committee oversaw the "social and political issues and risks" under "*ESG matters*" at least communicated that the Committee oversaw *any* material risk that arose from Target's pursuit of ESG mandates.

139. Contrary to what a reasonable investor would understand "social and political issues and risks" to mean, and unlike the boards of the companies discussed *supra* and other public companies, Target's Board—both directly and through its

Governance & Sustainability Committee—instead oversaw only the issues and risks arising from the corporation's perceived failure to achieve its ESG and DEI mandates.

140. Rather than overseeing social and political issues and risks to protect shareholder interests by serving Target's customers, as the 2022 Proxy and 2023 Proxy represented, the *actual* oversight responsibility Target's Board and the Governance & Sustainability Committee exercised focused on potential negative responses by "stakeholders" to Target's perceived failure to achieve ESG and DEI mandates.

141. Target elaborated on the meaning of this "stakeholder expectations"-driven ESG and DEI risk in its 2021 and 2022 annual reports (which each cover calendar years the 2022 Proxy and 2023 Proxy discuss, and which Target and Director Defendants caused Target to issue):

> [S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

Target Corp., 2022 Annual Report (Form 10-K) at 8 (emphasis added).

> Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I) and any perceived lack of transparency about those matters, could harm our reputation.

Target Corp., 2021 Annual Report (Form 10-K) at 7 (Mar. 9, 2022), https://tinyurl.com/rewehre4.

142. In the foregoing annual reports, Target identified as its principal ESG-matter risk the risk that failure to meet "stakeholder expectations" concerning its ESG and DEI commitments could adversely affect the company—including via a social risk, e.g., "harm our reputation," and political risks, e.g., "legal and regulatory proceedings." Target Corp., 2022 Annual Report, *supra*, at 8.

143. While Target's definition of these "stakeholder expectation"-based risks share similar impacts with social and political risks (such as reputational harm and legal and regulatory proceedings) risks arising from failure to meet "stakeholder expectations" are definably not "social or political issues and risks."

144. Instead, such "stakeholder expectation" risk is a separate category of risk that arises from negative responses by "stakeholders" to Target's failure (whether actual or perceived) to achieve the ESG and DEI mandates it has adopted.

145. The "stakeholders" to which Target ascribes these risks are not social or political classes or entities whose responses would create social or political risk, such as regulators or Target customers reacting to Target as participants in social or political movements, but a discrete and ascertainable group of nonprofit activists and organizations which Target consults—and even delegates responsibility to—in making its ESG and DEI commitments.

146. Target's engagements with these activists and organizations is not oversight of "social or political issues or risks" arising from Target's adoption of ESG and DEI commitments because the purpose of Target's engagements with them is to

adopt and implement those very ESG and DEI mandates regardless of the social or political issues or risks they create for Target.

147. These "stakeholders" include the nonprofit social and environmental activist entity As You Sow, *see e.g., Target Agrees to Plastic Elimination Goal,* AS YOU SOW (May 5, 2021), https://tinyurl.com/bddarcuc; the climate activist nonprofit charity the Carbon Disclosure Project, *Target Corporation CDP Climate Change Questionnaire*, CARBON DISCLOSURE PROJECT (Aug. 2022), https://tinyurl.com/tv88ewmj; the climate activist nonprofit Ceres, *see Target, U.S. Bank Join Ceres Company Network,* CERES (Aug. 31, 2017), https://tinyurl.com/bddcy4np; among others.

148. Target also agreed with As You Sow to implement a proposal that would expand Target's disclosure of its DEI programs. *Target Corp: Greater Disclosure of Material Corporate Diversity, Equity, and Inclusion*, AS YOU SOW (Dec. 21, 2022), https://tinyurl.com/nhz9kbv6.

149. Target's website lists a variety of "partners helping drive [their] climate and energy goals," including Anthesis, Apparel Impact Institute (AII), Arbor Day Foundation, Aspen Institute's Cargo Owners for Zero Emissions Vessels (coZEV), Business Ambition for 1.5°C, Business for Social Responsibility (BSR), CDP, Ceres, Clean Energy Buyers Association (CEBA), Gold Standard, Race to Zero, Science Based Targets Initiative, Sustainable Apparel Coalition (SAC), The Nature Conservancy, UNFCCC Fashion Industry Charter on Climate Action, World

Resources Institute (WRI), and World Wildlife Fund (WWF). *Climate and Energy,* TARGET, https://tinyurl.com/33rux5ps (last accessed Aug. 3, 2023).

150. Target partnered with social activist group Article One to "identify [Target's] most salient human rights risks." 2021 Target Corporate Social Responsibility Report (the "2021 CSR Report") at 19, https://tinyurl.com/67xve7yx. Based on this assessment, Target's "Salient Human Rights Risk Areas" in 2019 for Target included "DE&I," "Diverse and inclusive merchandise assortment and marketing promotions," and "Diverse workforce and equitable hiring and development practices." *Human Rights*, TARGET, https://tinyurl.com/3szb9tf4 (last accessed Aug. 3, 2023).

151. Target has also partnered with the social activist groups Human Rights Campaign, GLSEN, and the National Gay & Lesbian Chamber of Commerce, including signing legal briefs to support their social activism. *Stronger Together: Target Signs on in Support of the Equality Act,* TARGET (Sept. 10, 2015), https://tinyurl.com/34wmwhyj.

152. Target has established an elaborate "stakeholder" input governance structure overseen by the Governance & Sustainability Committee.

153. Target's management describes this structure in its 2022 ESG Report and 2021 CSR Report, which were produced under the Board's and the Governance & Sustainability Committee's oversight. *See* 2022 Target ESG Report, *supra*, at 56; 2021 Target CSR Report, *supra*, at 63.

154. In these reports, Target describes how it relies on "stakeholders" to select and implement Target's ESG and DEI mandates.

155. The 2022 ESG report laid out Target's approach, which grounded Target's ESG mandates in a series of benefits to its "business" and "stakeholders," including "people" and "the planet":

> **ESG Priorities**
>
> We aim to center our business strategy, investments, engagement and reporting on the environmental, social and governance (ESG) topics that are most important to our business *and our stakeholders* across our value chain.
>
> As we seek to accelerate our progress – and leverage our size and scale to benefit people, the planet, and our business – our ESG priorities guide our actions in a cohesive, compelling, and risk-minded manner.

2022 Target ESG Report, *supra*, at 8 (emphasis added).

156. Target discussed how it uses "stakeholders['] . . . valued perspectives to inform our approach to systemic change," and summarized its "stakeholder engagement" as including the following:

> **Guests**
>
> **Topics Raised**
>
> - Community impact
> - Elevating equity in supply chains and communities
> - Environmental impacts of products
> - Materials and resource use
> - Non-discrimination
> - Product and packaging design
> - Responsible marketing

*Id*. at 9.

157. Target's 2021 CSR Report, which covers the preceding year for which the 2022 Proxy made its disclosures, described similarly that Target "seek[s] to center our strategy, investments, internal and external engagement, and reporting on the ESG topics that are most material to our business *and our stakeholders* across our value chain." 2021 Target CSR Report, *supra*, at 15.

158. The 2021 CSR Report also notably included in the "Topics Raised" with "Guests" section "Diverse and inclusive marketing" and "Sustainable and inclusive products," themes that Target would use to justify the LGBT-Pride Campaign. *Id*.

159. Under this ESG governance framework, overseen by the Board and the Governance & Sustainability Committee, Target has dutifully adopted the ESG and DEI mandates sought by these activists. *See supra* ¶¶ 62–64, 148.

160. As evidenced by the Board's, the Governance & Sustainability Committee's, and Target's focus on "stakeholders" under its ESG risk framework, the Governance & Sustainability Committee did not oversee social and political issues and risks as the 2022 Proxy and 2023 Proxy represented.

161. Moreover, the LGBT-Pride Campaign was so egregiously offensive to Target's core customer base that no reasonable Board oversight of social and political issues and risks of ESG matters would have permitted it to go forward.

162. The fact that Target engaged in the uniquely controversial LGBT-Pride Campaign is prima facie evidence of the Board's lack of oversight of social and political issues and risks.

2. Even if a reasonable investor would consider "stakeholder expectations" a social or political issue or risk, the Board's selective oversight of only left-wing social or political issues rendered the 2022 Proxy and 2023 Proxy materially misleading.

163. Even if a reasonable investor would consider the Target Board's focus on its "stakeholder expectations" version of ESG and DEI risk oversight to include oversight of social and political issues or risks to it pursuit of ESG and DEI goals, the Board's selective focus on the social and political issues and risks of only issues associated with the political left rendered misleading the 2022 and 2023 proxy statements' representations that the Board oversaw "social and political issues and risks."

164. Instead of overseeing social and political issues and risks relating to ESG mandates in good faith regardless of the ideological valence of those risks, the Board and the Governance & Sustainability Committee only oversaw risks arising from one end of the political spectrum.

165. The 2022 Proxy's and 2023 Proxy's statements that the Governance & Sustainability Committee oversaw "social and political issues and risks" of ESG matters were a pretext for the Board's and management's one-track focus on left-wing social and political issues.

166. A reasonable investor would conclude that the Governance & Sustainability Committee's oversight of "social and political issues and risks" related to ESG matters would include *any* material risk related to Target's ESG mandates,

whether from Target's "failure to achieve" its ESG mandates or from Target's pursuit of ESG mandates in the first place. *See supra* ¶¶ 126–136.

167. Contrary to what a reasonable investor would understand "social and political issues and risks" to mean, and unlike the boards of the companies discussed *supra* ¶¶ 130–133 and other public companies, Target's Board—both directly and through its Governance & Sustainability Committee—instead oversaw only the issues and risks arising from Target's perceived *failure to achieve* its ESG and DEI mandates. *See supra* ¶¶ 138–143 (alleging facts regarding the scope of the Board's and Governance & Sustainability Committee's oversight).

168. Target's ESG and DEI mandates align with one end of the political spectrum: the left. The Governance & Sustainability Committee's exclusive focus on the perceived risks of Target's "failure to achieve" its ESG and DEI mandates therefore focused on risks arising from one end of the political spectrum. But to a reasonable investor, "social and political issues and risks" can arise from *any* part of the political spectrum—just as the backlash to Target's LGBT Pride campaign evidenced.

169. Target further demonstrated its oversight of only left-wing ESG risks, rather than material social or political issues or risks generally, by engaging in an ideologically motivated campaign to restrict conservative books from its stores and other sales platforms.

170. This campaign began in 2020, when Target responded to a Twitter user accusing Target of platforming "transphobia" by removing a book from its stores. *See*

Madeline Osburn, *Target Swiftly Bans Book On Behalf Of Anonymous Twitter User Crying 'Transphobia'*, THE FEDERALIST (Nov. 13, 2020), https://tinyurl.com/5xdhvdff.

171. After predictable "political backlash" to this move, Target reversed its decision to remove the book. Charles Bowyer & Jerry Bowyer, *Target Hits Books*, NAT'L REV. (July 30, 2021), https://tinyurl.com/mrxhsbwu.

172. However, Target then quietly introduced official content-based bookselling "guidelines" that systematically banned the sale of numerous conservative and right-of-center books, including those they had just put back on the shelves in response to political backlash. *Id.*

173. Banned books included Mark Levin's THE DEMOCRAT PARTY HATES AMERICA (2023), *see* Paul Bedard, *Target Bans Mark Levin Book, Scared of Offending Democrats,* WASH. EXAMINER (July 5, 2023), https://tinyurl.com/yhahvhda; Abigail Shrier's IRREVERSIBLE DAMAGE (2020), *see* Charles Bowyer & Jerry Bowyer, *supra*; Dr. Deborah Soh's THE END OF GENDER (2020), *see id.*; and Matt Walsh's JOHNNY THE WALRUS (2022), *see* Dave Urbanski, *Matt Walsh Says His Best-Selling 'Johnny the Walrus' Book Was Removed from Amazon's LGBTQ Section As Well As Target's Website: 'The Canceling Begins',* BLAZE MEDIA (Dec. 10, 2021), https://tinyurl.com/bdz9hrne.

174. Target engaged in and continues to engage in this campaign despite ongoing political backlash, suggesting the Board has not overseen social and political risks to the campaign.

175. Target management's self-identified "stakeholders," *see supra* ¶¶ 147–151, skew heavily in a distinct and left-wing ideological direction and do not appear to include any culturally or socially conservative groups that would be closer to representative of the average Target shopper and the potential source of social or political risks.

176. The 2022 and 2023 proxy statements' assurance of the Board's oversight of "social and political issues and risks" arising from Target's ESG mandates conveyed to investors that the Board oversaw material social and political issues and risks of all kinds related to their ESG mandates.

177. However, the Board only oversaw perceived issues and risks from one side of the spectrum.

178. Alternatively, even if the phrase "social and political issues and risks" meant only left-wing, pro-ESG "issues and risks," the 2022 Proxy and 2023 Proxy were still misleading because they omitted to state the material fact that those were the issues that the Board viewed as material social and political issues and risks arising from Target's ESG mandates.

**B. The 2022 and 2023 Proxy Statements Misleadingly Stated That Target's ESG and DEI Mandates Were Adopted to Advance Shareholder Value.**

179. In the 2022 Proxy and the 2023 Proxy, the Board represented that Target adopted ESG and DEI mandates in order to advance shareholder value.

180. But in public comments and other documents, Target's officers admitted the presence of collateral, non-shareholder interests in Target's adoption and pursuit of ESG and DEI commitments.

181. In the 2022 Proxy and 2023 Proxy, Target repeatedly asserted that the Board acted to advance shareholder interests across all Company transactions, including with respect to its ESG and DEI mandates.

182. The 2022 Proxy and 2023 Proxy both communicated that "the Board prefers to maintain the flexibility to determine which leadership structure best serves *the interests of Target and our shareholders*." 2022 Proxy at 10; 2023 Proxy at 10 (emphasis added).

183. The 2022 Proxy and 2023 Proxy also stated that the Board, through its Audit & Risk Committee, would, with respect to conflicted transactions between Target and its directors or executive officers, act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders." 2022 Proxy at 17; 2023 Proxy at 18.

184. The 2022 Proxy and 2023 Proxy stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets." 2022 Proxy at 17; 2023 Proxy at 17.

185. These representations were material because a reasonable investor would have understood these statements to clarify that, despite Target's commitment of significant business resources to ESG and DEI mandates and the Board's and

management's preferred political and social agendas, the Board and management remained focused on shareholder value.

186. But during the period Plaintiff owned Target stock, numerous Target officers and at least one Director Defendant admitted that Target's ESG and DEI mandates were formulated and enforced to serve collateral "stakeholder" interests, not shareholder interests.

187. In an interview on May 17, 2023, Defendant Cornell stated that Target's DEI commitments were "the right thing for society." *See supra* ¶ 67.

188. In Target's 2022 ESG Report and 2021 CSR Report, Target repeatedly asserted that its management, as overseen by the Board, managed the company for collateral stakeholder benefits. *See supra* ¶¶ 153–157.

189. Target's chief diversity officer's comments on Target's DEI goals as an "infrastructure . . . that allows you to integrate DE&I into your ecosystem in a way that truly drives your business" revealed that Target's DEI goals *drove Target's business* rather than serving the subordinate role of advancing shareholder value. *See supra* ¶ 64.

190. Moreover, the Board and management delegated the implementation of Target's ESG and DEI mandates to Target officials who could not do implement those mandates in good faith consistent with shareholder interests because the officials suffered from disabling personal conflicts of interest, including with some of the very activists that Target partnered with in adopting and pursuing the ESG and DEI mandates.

191. For example, Target senior executive Carlos Saavedra served as treasurer at GLSEN, and Target's Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, served on the Board of GLSEN. *See supra* ¶ 60. These positions would have imposed conflicting duties on those officers and precluded them from implementing Target's ESG and DEI mandates related to GLSEN and the LGBT-Pride Campaign in good faith to advance shareholder interests.

192. Target's chief diversity officer also indicated her personal commitment to advancing "racial equity" for its own sake, even if it was "provocative," and singled out "white women" for special obligations to this cause. *See supra* ¶ 64.

193. This conduct indicates and reveals that the 2022 Proxy's and 2023 Proxy's statements that Board oversaw Target's ESG and DEI mandates to advance shareholder interests were misleading because, in reality, the Board delegated the execution of these mandates who could not advance shareholder value in good faith.

### C. The 2022 and 2023 Proxy Statements Misleadingly Stated Target's Executive Compensation Plans Were Designed to Align with Shareholder Value When They Instead Incentivized Target's Achievement of DEI Goals.

194. In seeking shareholders' approval of Target's executive compensation plans, the 2022 Proxy and 2023 Proxy represented that the plans aligned executives' incentives with maximizing shareholder value. In reality, Target's executive compensation was designed to substantially incentivize executives to pursue Target's DEI mandates.

195. The 2023 Proxy outlined Target's "Executive compensation guiding principles," which provided, in full:

> We believe executive compensation should be *directly linked to performance and long-term value creation for our shareholders*. With that in mind, three principles guide our compensation program:
>
> - Deliver on our pay for performance philosophy in support of our strategy.
> - Provide a framework that encourages *outstanding financial results* and shareholder returns over the long-term.
> - Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.

2023 Proxy at 39 (emphasis added). The 2023 Proxy further elaborated on Target's "long-standing belief that our executive compensation should directly reflect our organization's performance *with substantial emphasis on creating long-term value for our shareholders*. *Id*. (emphasis added). Target also attested that "[t]he pay programs described throughout [the 2023 Proxy] align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 38.

196. A reasonable investor would understand these representations to mean that Target's executive compensation was substantially aligned with advancing Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

197. In reality, however, Target awarded substantial amounts of executive compensation based on its executives' "performance" of satisfying ambiguous and subjective DEI goals.

198. Buried within multiple layers of the 2023 Proxy and scattered from its discussion of executive-compensation principles, a close reading of the 2023 Proxy reveals that substantial sums of executives' compensation were not connected to shareholder value at all, but instead were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.

199. Under the heading "Pay for performance," a footnote described that Target's executive compensation included a component ambiguously (and innocuously) labeled "STIP" (an acronym the 2023 Proxy never defines, but which presumably stands for "Short Term Incentive Plan"). 2023 Proxy at 39. The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance":

> The following pay elements are performance-based and represent a significant percentage of Annual TDC:
>
> - STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard

*Id.* at 40.

200. In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy further provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities." *Id.* at 41 (emphasis added).

201. Tables accompanying this section and others provided further that the "Team scorecard" component of "STIP" receives a 33% "Weight." *Id*. at 41, 43.

202. The investor-reader following along in the 2023 Proxy would, so far, understand that Target aligned its executive compensation with shareholder value, defined under quantifiable performance-based financial metrics; that executive compensation includes a component called STIP; and that STIP is a performance based measure based on "financial goals and progress made toward key strategic priorities."

203. These statements were misleading in light of a final section that was buried below and scattered from the 2023 Proxy's initial declaration that executive compensation was aligned with shareholder value.

204. In a different section, under a heading titled "Fiscal 2022 team scorecard assessment," the 2023 Proxy described that the "team scorecard component of the STIP. . . emphasized the business outcomes we expect from the execution of strategic priorities." *Id*. at 44. Those priorities, or "specific team scorecard progress indicators," included that executives "advance[d] progress on our new three-year enterprise DE&I goals." *Id*. at 44. Target's DEI goals—or any other nonfinancial goals or subjective measurements—were not mentioned in Target's guidelines for executive compensation.

205. Moreover, the section provided that this "team scorecard assessment" affected not only the STIP component of Target's executive compensation plan, but also "provides a general structure for discussing and measuring performance" of

executives for compensation purposes. *Id*. at 44. This is in direct conflict with Target's "guiding principle[]" of alignment with Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

206. The 2022 Proxy made substantially the same representations as the 2023 Proxy regarding the alignment of Target's executive compensation with shareholder value, and the allegations *supra* paragraphs 195–205 are repeated and re-alleged here with respect to the 2022 Proxy.

207. The 2022 Proxy stated the same "guiding principles" for executive compensation, including to "encourage[] outstanding financial results and shareholder returns over the long-term." 2022 Proxy at 40.

208. The 2022 Proxy expressed Target's "long-standing belief that our executive compensation should directly reflect our organization's performance with substantial emphasis on the creation of long-term value for our shareholders." *Id.* at 37.

209. The 2022 Proxy also stated that "[t]he pay programs described throughout our CD&A align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 35.

210. Like the 2023 Proxy, the 2022 Proxy also failed to describe the STIP component of executive compensation with specificity or connection to its executive compensation principles, describing it under the heading "How annual CEO pay is

tied to performance" as "STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the Team Scorecard." *Id.* at 37.

211. When the 2022 Proxy described the Team Scorecard, it stated that the STIP component was based, in part, on "[p]ositive progress on three-year enterprise DE&I goals," including because "[w]e met or exceeded our ambitious goals for representation, advancement, and experience" and "[w]e increased promotion and reduced turnover rates for people of color." *Id.* at 43.

212. This buried, scattered, and conflicting information in the 2023 Proxy and 2022 Proxy rendered Target's representation that its executive compensation was aligned with shareholder value misleading.

## IV. In Issuing the 2022 and 2023 Proxy Statements, Defendants Knowingly Misled Target Investors

213. Defendants had constructive knowledge that the 2022 and 2023 Proxy Statements misled investors by falsely and misleadingly (i) reassuring investors that the Board oversaw social and political issues and risks arising from Target's ESG and DEI goals; (ii) stating the Board and management adopted ESG and DEI goals to advance shareholder value; and (iii) stating Target's executive compensation plans were aligned with incentives for executives to enhance shareholder value.

214. By virtue of their positions with Target, the Director Defendants were provided with copies of Target's proxy statements and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with

Target, and their access to material, non-public information available to them, but not to the public, the Director Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

215. Defendants were also aware or should have been aware of red flags pertaining to the Board's oversight of social and political risks of Target's ESG and DEI goals, including risks relating to pursuing "stakeholder" value over shareholder value, and incentivizing its executives to pursue these goals via executive compensation plans.

216. Defendants would specifically have been on notice that Target was subject to significant social and political risk due to its activism on LGBT political issues because Target was recently the subject of a large customer boycott organized after Target entered the political fray on *another* LGBT political issue, namely, Target's response to the North Carolina transgender bathroom law. *See supra* ¶¶ 50–55.

217. Defendants Cornell, Edwards, Healey, Knauss, and Rice knew Target was subject to significant social and political risk from its activism on LGBT political issues because they served on the Board during Target's response to the North Carolina transgender bathroom law.

218. Defendant Cornell was or should have been aware of the social and political risks to Target's ESG and DEI activism. As CEO, Defendant Cornell was privy to Target positions on controversial political and social issues. After Target's "botched" response to the 2016 North Carolina transgender law, company policy

reportedly required that all "public pronouncements on hot-button issues may not be made without Mr. Cornell's consent." Safdar, *supra*.

219. Defendants would have also been on notice to the risk of customer boycotts against consumer-facing companies like Target that undertook LGBT-issue oriented campaigns, like the boycott Target experienced for its stance on transgender issues in 2016. In April, a month before Target began the LGBT-Pride Campaign, a consumer boycott of the brand Bud Light over its LGBT marketing campaign cost the brand over 25 percent in sales. Daniel Newman, *Bud Light Sales Continue to Plummet After Transgender Marketing Controversy*, ST. LOUIS POST-DISPATCH (May 1, 2023), https://tinyurl.com/59skyrsm. Similar boycotts and backlash over LGBT marketing and product campaigns also hit other companies before Target's 2023 Pride Campaign, including:

- National Basketball Association, *see* Clay Travis, *NBA is America's First Bud Light-style Fiasco But You're Not Supposed to Know That*, FOX NEWS (July 8, 2023), https://tinyurl.com/522a45pc;
- National Football League, *see* Daniel Roberts, *Poll: 33% of NFL Fans 'Purportedly Stopped Watching' This Season*, YAHOO NEWS (Jan. 8, 2018), https://tinyurl.com/3vcc7nah;
- Major League Baseball, *see* Andrew Solender, *Republicans Vow Boycott, Retaliation Against MLB Over Pulled All-Star Game*, FORBES (Apr. 2, 2021), https://tinyurl.com/452weztf;

- Netflix, *see* Staff and Agencies, *Cuties Controversy Sparks #CancelNetflix Campaign*, THE GUARDIAN (Sept. 11, 2020), https://tinyurl.com/4x3ssn9x;
- Nike, *see* Lauren Thomas, *Nike Shares Fall as Backlash Erupts Over New Ad Campaign Featuring Colin Kaepernick*, CNBC (Sept. 4, 2018).
- The Walt Disney Company, *see* Andrew Stiles, *Disney Stock Down 33 Percent Since CEO Instigated Feud with DeSantis*, WASH. FREE BEACON (May 24, 2023), https://tinyurl.com/ycwztnea;
- Gillette, *see* Katie Pavlich, *Woke to Broke: Gillette Loses Billions After Anti-Men, Transgender Shaving Ads*, TOWNHALL (Aug. 1, 2019), https://tinyurl.com/2dt6c7fb; and
- Jack Daniel's, *see* Aleks Phillips, *Jack Daniels Faces Boycott Calls Over LGBT Campaign: 'Lost a Loyal Drinker'*, NEWSWEEK (Apr. 6, 2023), https://tinyurl.com/2c43bxe4.

220. Numerous companies, including Target competitors and similarly positioned companies and brands, faced concurrent backlash with Target for this year's LGBT-themed campaigns, such as:

- Walmart, *see* Giulia Carbonaro, *Walmart Under Fire for LGBTQ+ Merchandise After Target Retreats*, NEWSWEEK (May 24, 2023), https://tinyurl.com/4d9ywpvk;

- Kohl's, *see* Lee Brown, *Kohl's Latest Retailer Facing Boycott Calls for Selling Pride Onesie for Babies: 'Time for a Bud-Lighting'*, N.Y. POST (May 29, 2023), https://tinyurl.com/3ta2c3cj;
- PetSmart, *see* Aubrie Spady, *PetSmart Faces Boycott Calls for 'Pride Dog Bikini,' Donations to Group Pushing Gender Ideology on Students*, FOX NEWS (June 1, 2023), https://tinyurl.com/2nsp3dve;
- Starbucks, *see* Amelia Lucas, *Starbucks Union Claims Dozens of Stores Aren't Allowed to Decorate for Pride*, CNBC (June 13, 2023), https://tinyurl.com/4w27hksw;
- Cracker Barrel, *see* Kristopher J. Brooks, *Cracker Barrel Faces Boycott Call for Celebrating Pride Month*, CBS NEWS (June 9, 2023), https://tinyurl.com/nst84fxf;
- The North Face, *see* Danni Button, *North Face is Latest Target of Backlash After Pride Celebration Ad*, THE STREET (May 25, 2023), https://tinyurl.com/4ffft7x5;
- LEGO, *see* Shannon Thaler, *LEGO Becomes Latest Company Facing Boycotts Over Its 'Transgender Building Sets'*, N.Y. POST (June 1, 2023), https://tinyurl.com/2p85wpyn; and
- Adidas, *see* Jessica Guynn, *Is Adidas Having a Bud Light Moment? Transgender Pride Swimsuit Touches Off Controversy*, USA TODAY (May 19, 2023), https://tinyurl.com/5ee6ftcj.

221. Defendants would have been on notice that Target faced risk of backlash because of Target's customer base of working and middle-class families and Target's revenue share from stores located in culturally conservative areas.

222. Defendants had or should have had notice of growing "anti-ESG" backlash by consumers and governments. To date, at least 99 so-called "ESG backlash" bills have been filed in state legislatures, and anti-ESG bills have become law in at least 16 states. Ross Kerber, *Business Fights Back as Republican State Lawmakers Push Anti-ESG Agenda*, REUTERS (Apr. 24, 2023), https://tinyurl.com/yfea62s5; Adam Aton & Avery Ellfeldt, *States Shrug Off Warnings, Plow Ahead with Anti-ESG Laws*, E&E NEWS (June 22, 2023), https://tinyurl.com/5yhpwvxy. Numerous companies have recognized anti-ESG backlash as a material social and political risk arising from their pursuit of ESG goals. *See supra* ¶¶ 130–133. And it is an emerging consensus among board-focused advisers and publications that directors should oversee anti-ESG risks. *See, e.g.*, Isabel Gottlieb, *Anti-ESG Backlash is Phenomenon Boards Must Tackle, Lipton Says*, BLOOMBERG LAW (July 27, 2023), https://tinyurl.com/yb4p45wn; Brooke Goodlett et al., *The "Anti-ESG" Movement: Balancing Conflicting Stakeholder Concerns and Inconsistent Regulatory Regimes*, DLA PIPER (Feb. 21, 2023), https://tinyurl.com/2rp9j44d.

223. Defendant Cornell had or should have had knowledge of risks relating to prioritizing stakeholder over shareholder benefit because he signed, in his capacity as "Chairman & CEO," the Business Roundtable's controversial 2019 Statement on the Purpose of a Corporation, in which he pledged to make "a fundamental commitment

to all of our stakeholders" over directors' and officers' traditional duties to shareholders. *Statement on the Purpose of a Corporation*, BUS. ROUNDTABLE (Aug. 19, 2019), https://tinyurl.com/2z24skvy; *see generally* Stephen M. Bainbridge, *Making Sense of the Business Roundtable's Reversal on Corporate Purpose*, 46 J. CORP. L. 285, 285–289 (2021).

224. Defendant Target had notice and Defendant Cornell had or should have had notice of Target's contracting with a Satanist-inspired brand Abprallen. *See supra* ¶¶ 75, 78.

225. Defendant Target had notice and the Director Defendants had or should have had notice of social and political risks from the LGBT-Pride Campaign because Target delegated the execution of business strategy to officers who had known and publicly-disclosed disabling conflicts of interest that prevented them from being able to execute Target's ESG and DEI-related business strategies in good faith. *See supra* ¶¶ 60, 190–192.

226. Defendant Cornell had a motive to mislead Target's investors as to the Board's lack of oversight of the risks of pursuing Target's ESG and DEI programs because his compensation was based in part on Target's advancement of subjective DEI goals like that which the LGBT-Pride Campaign intended to accomplish.

## V. The 2022 Proxy and 2023 Proxy Caused Plaintiff's Losses by Causing Shareholders' Approval of the Board's ESG and DEI Efforts and Artificially Inflating Target's Stock Price.

227. The materially false and misleading statements in the 2022 Proxy and 2023 Proxy caused Plaintiff's losses by (i) misinforming Target shareholders as to the

Board's competencies and qualifications for re-election, contributing to the reelection of directors who subjected Target and Target shareholders to significant monetary and reputational damage, (ii) misinforming Target shareholders as to the Board's competencies and qualifications for re-election, contributing to shareholders' rejection of reforms to the Board's structure and accountability that could have prevented such losses, (iii) artificially inflating Target's stock price, causing losses when the facts of Defendants' misstatements and omissions were revealed, and (iv) misinforming Target shareholders as to the Board's compensation-based incentives to pursue DEI goals, contributing to shareholders' approval of DEI-based executive compensation plans that incentivized executives to harm Target shareholders, and causing the independent harm to Target shareholders of Target making unauthorized and excess compensation payments to executives.

1. Shareholders' Re-election of Directors on the Basis of Their Proclaimed ESG-Risk Management Competencies was an Essential Link to the LGBT-Pride Campaign.

228. As a result of Target's mailing of the misleading 2022 Proxy, Target shareholders voted to reelect Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton to the Board.

229. As a result of Target's mailing of the misleading 2023 Proxy, Target shareholders voted to reelect Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton to the Board.

230. The re-election of Target's directors in 2022 and 2023 were each essential links in causing the LGBT-Pride Campaign and the resulting losses to Plaintiff and other Target shareholders.

231. Given the likely time it would have taken for Target management to plan and execute the 2023 LGBT-Pride Campaign, any Board-level oversight of the social and political risks of the LGBT-Pride Campaign would likely have occurred after the 2022 Annual Meeting, which was held on June 8, 2022.

232. The 2022 Annual Meeting squarely presented the issue of the Board's oversight of ESG and DEI matters.

233. The 2022 Annual Meeting was the first meeting after Target's Board overhauled its Board Committee structure to establish the Governance & Sustainability Committee, *see supra* ¶¶ 114–125, and therefore was the first opportunity shareholders had to consider director candidates in light of the Governance & Sustainability Committee's purported oversight of social and political issues and risks.

234. In the 2022 Proxy, unlike in previous proxy statements, Target also employed a line item in its director "skills and diversity matrix" that highlighted the director-candidates' skill of "ESG Understanding," or "[k]nowledge or experience that contributes to the Board's understanding of one or more ESG matters affected by our business," and awarded the attribute to nine of the eleven non-company employee directors on the Board—each of whom shareholders re-elected at the 2022 Annual Meeting. 2022 Proxy at 22.

235. Unlike in previous proxy statements, the 2022 Proxy's matrix also included the director skill of "Reputation Management," defined as "[e]xperience in community relations, public service, government affairs, corporate governance," and marked all eleven of the independent directors as having that skill. *Id*. at 22.

236. The 2023 Annual Meeting was held on June 14, 2023, amid the LGBT-Pride Campaign customer backlash and during Target's lingering stock-price decline.

237. Given the intense focus on the LGBT-Pride Campaign at the time of the 2023 Annual Meeting, the Target Board's purported oversight of social and political issues and risks was a central issue of the directors' reelection.

238. The 2023 Proxy called for directors' re-election by expanding on the 2022 Proxy's attribute of "ESG Understanding" with an attribute labeled "ESG," which denoted the directors' "[e]xperience in strategies supporting sustainable long-term value creation or any matters included in our ESG priorities; actively supervising someone performing similar functions; or on a board of directors overseeing any matters included in our ESG priorities." 2023 Proxy at 22.

239. The 2023 Proxy marked ten of the eleven independent directors with this new "ESG" attribute in calling for their re-election. *Id*. at 23.

240. The 2023 Proxy's director skills and diversity matrix also notably updated its definition of "Reputation Management" to include "[e]xperience in . . . *crisis response*" (and still marked ten of the eleven independent directors as having this now-revised skill). 2023 Proxy at 22 (emphasis added).

241. The 2023 Proxy also added language to each of the Defendants' biographies not previously included in Target's proxy statements, noting Defendants' skills that "enhanc[e] the Board's collective oversight capability." 2023 Proxy at 23–29.

242. The 2023 Proxy's biographies for Defendants Abney, Baker, Barrett, Boudreaux, Knauss, Leahy, Lozano, Rice, and Stockton also each included new language highlighting their "risk management, reputation management, and ESG skills." *Id.*

243. The biographies for the other directors also included similar new language: Defendant Cornell's biography highlighted his "skills . . . including . . . risk management, reputation management, and ESG," Director Puma's bio mentioned her "risk management" and "ESG skills" (but omitted any "reputation management" skills), and Defendant Edwards's bio mentioned only "risk management" and "reputation management" skills. *Id.* at 25, 26, 28.

244. These representations put into issue the Board's competence to manage social and political issues and risks arising from Target's pursuit of ESG and DEI mandates and contributed to shareholders re-electing directors on that basis.

245. Instead of stopping the ongoing LGBT-Pride Campaign and attempting to reverse the damage caused by the LGBT-Pride Campaign, immediately after the directors were reelected, Target continued the LGBT-Pride Campaign and continues to sell products associated with the Campaign, causing further damage to Target's stock price and enabling continuing consumer backlash.

2. Shareholders' Rejection of Good-Governance Shareholder Proposals on the Basis of the Board's Risk-Management Competencies Was an Essential Link to the LGBT-Pride Campaign.

246. As a result of Target's mailing of the 2023 Proxy, Target shareholders also rejected a proposal to separate the positions of CEO and Board Chairman (the "Independent Chairman Proposal").

247. The Independent Chairman Proposal noted that Target had not yet adopted this corporate governance "best practice" and that Target's current arrangement allowed the Chairman/CEO to "ignore the advice and feedback" from independent directors, suggesting Target "does not take the role of lead director seriously." 2023 Proxy at 71.

248. In recommending that shareholders vote against the proposal, the 2023 Proxy stated:

> The Board believes that its current leadership structure and governance practices provide effective, independent oversight without mandating a predetermined Board leadership structure . . . The Lead Independent Director role provides effective, independent leadership through its clearly defined and robust set of roles and responsibilities.

*Id.* at 71–72. In reliance on the 2023 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

249. This was also an essential link to the LGBT Pride Campaign because it permitted Defendant Cornell to maintain immense influence over the Board, which would enable any attempt by Defendant Cornell to prevent the Board's oversight of social and political issues and risks arising from his management's engagement in the LGBT-Pride Campaign.

250. As a result of Target's mailing of the misleading 2022 Proxy, Target shareholders also rejected a proposal to enable shareholders to more easily nominate candidates for election to the Board (the "Director Nomination Proposal").

251. The Director Nomination Proposal explained that Target's bylaws required that, in order for a shareholder or group of shareholders to be eligible to nominate a candidate for election to the Board, the shareholder or group must own at least 3 percent of Target's outstanding stock and, in the case of a group, not exceed more than 20 shareholders. 2022 Proxy at 69.

252. The Director Nomination Proposal requested that the Board instead "enable as many shareholders as may be needed [] combine their shares" in order to nominate director candidates. *Id*.

253. Noting that the proposed change would "serve[] as a guardrail to make sure that management elects the best directors" by improving shareholders' remedies if Target's "management does not engage in good faith," the Proposal concluded that "[c]ompetition is good for our board of directors." *Id*.

254. The Board opposed the Director Nomination Proposal and recommended that Target shareholders vote against it. *Id*. at 69–70.

255. In advocating its opposition, the Board reiterated it was "committed to being accountable to shareholders and has shown that commitment through both its policies and practices." *Id*. at 70.

256. In reliance on the 2022 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

257. This was also an essential link to the LGBT Pride Campaign because it further insulated the Board from accountability and enabled to Board to fail to oversee social and political issues and risks.

3. Losses Caused By Defendants' Misstatements and Omissions.

258. Throughout the period that Plaintiff owned Target stock, as detailed above, the price of Target's common stock was artificially inflated as a direct result of the Defendants' material misrepresentations and omissions regarding the Board's oversight social and political issues and risks arising from Target's ESG and DEI mandates and the consistency of those mandates with shareholder value. When these misstatements and omissions were revealed when Target launched the LGBT-Pride Campaign and Target's customers responded by boycotting the store, Target's stock price fell immensely.

259. During the period the Plaintiff owned Target stock, Target's stock reached a high of approximately $241 per share in April 2022. When Plaintiff purchased the stock on April 11, 2022, the closing price was $229.31. Prior to the revelation of the LGBT-Pride Campaign, Target's stock was priced at $160.96. The true value of Target's stock during the period, as evidenced by its sharp drop to $126 and flatline near $130 since, was significantly less than $229.31, its peak price during the period of $241 per share, or its pre-LGBT-Pride Campaign price of $160.96.

260. Target's peers did not see similar stock declines during the same period. From May 17, 2023 to June 14, Walmart Inc. common stock (NYSE: WMT) increased from a price of $149.53 to $156.87. Costco Wholesale Corporation

(NASDAQ: COST) saw its common stock increase from $495 to $527.20 over the same period. Kroger (NYSE: KR) stock fell from $49.25 to $47.21 during the same period, which was a 4% drop (compared to Target's nearly 19% decline during the same period).

261. Defendants concealed the true financial condition of the Company, its true risk management and oversight procedures, and material risks to Target's value.

262. These misstatements and omissions caused financial loss to Plaintiff and other shareholders. *See supra* ¶¶ 80–86.

4. Shareholders' Approval of Unauthorized and Excess Executive Compensation Was An Essential Link to the LGBT-Pride Campaign & Independently Caused Loss.

263. At both the 2022 and 2023 annual meetings, shareholders approved Say on Pay items for Target's executive compensation plan proposals in reliance on misleading statements and disclosures in the 2022 and 2023 proxy statements. At each meeting, shareholders approved the following resolution:

> Resolved, that the shareholders approve the compensation awarded to the NEOs, as described in the [Proxy Statement], tabular disclosures, and other narrative executive compensation disclosures in the 2023 [or, in the case of the 2022 Proxy, 2022] Proxy Statement.

264. Shareholders' approval of each executive compensation plan was an essential link in causing the LGBT-Pride Campaign and Plaintiff's losses resulting from it.

265. Both the executive compensation plans approved by shareholders materially incentivized Target executives to advance Target's DEI goals, which the LGBT-Pride Campaign also advanced.

266. For the executive compensation approved at the 2022 annual meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included meeting spending targets with "diverse suppliers," such as the "LGBTQIA+-owned suppliers" Target mentioned in its 2022 ESG Report. Press Release, *Inside Target's 2019-2021 Diversity, Equity & Inclusion Journey – and Where We're Going Next* (Mar. 7, 2022), https://tinyurl.com/m5hbm64s.

267. Named Executive Officers (NEOs), including Defendant Cornell, also would have reasonably expected that engaging in the LGBT-Pride Campaign would improve their outcomes under the Team Scorecard for DEI progress, and thereby increase their compensation.

268. For the executive compensation approved at the 2023 meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included Target's goal to "increase relevance with diverse guests" and "offer more products from diverse suppliers." *Id.*

269. The shareholder approval of each executive compensation plan in the 2022 Proxy and 2023 Proxy, respectively, also authorized an independent harm to Target and Target shareholders by paying Target NEOs unauthorized compensation and excess compensation.

270. In reliance on the misleading executive compensation disclosures, Target paid NEOs (including Defendant Cornell) executive compensation that was not approved by shareholders. At the 2022 annual meeting, Target shareholders approved over $42.8 million in compensation to Target NEOs. 2022 Proxy at 53.

271. At the 2023 annual meeting, Target shareholders approved over $36.9 million. 2023 Proxy at 53. Target secured shareholder approval of these sums via misleading proxy statements that tainted the shareholder approval process and renders these amounts unauthorized by shareholders.

272. In reliance on the misleading executive compensation disclosures, Target shareholders approved excess and unmerited compensation to Target NEOs (including Defendant Cornell).

273. In the 2022 executive compensation plan, NEOs received over $2.5 million in STIP payouts for the "team scorecard component" that included progress on DEI goals. 2022 Proxy at 53. In 2023, they received nearly $1.5 million. 2023 Proxy at 53.

274. The payment by Target of such unauthorized and excess sums harmed Target shareholders, including Plaintiff, by interfering in Target's proper corporate governance, wasting corporate assets, and incentivizing value-destroying behavior by Target's executives.

## VI. Plaintiff Relied on Defendants' Misstatements and Omissions in the 2022 and 2023 Proxy Statements.

275. As a shareholder eligible to vote at Target's annual meetings, Plaintiff relied on Defendants' misstatements and omissions in the 2022 and 2023 Proxy Statements.

276. As a result of the misconduct alleged herein (Defendants' misstatements and omissions), the market for Target securities was artificially inflated. Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" theory and *Affiliated Ute* apply.

277. Plaintiff justifiably expected the Defendants to disclose material information as required by law and SEC regulations in the Target's periodic filings with the SEC and in the Company's other statements directed to its investors. The Defendants were under a fiduciary duty to make such disclosures. Thus, reliance by Plaintiff should be presumed with respect to the Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

278. The market for Target's securities was, at all times, an efficient market that promptly digested current information with respect to Target from all publicly-available sources and reflected such information in the prices of Target's securities. When Plaintiff purchased Target stock and throughout the period of his ownership:

(a) Target's stock met the requirements for listing and was listed on the New York Stock Exchange;

(b) As a regulated issuer, Target filed periodic public reports with the SEC;

(c) Target's securities volume was substantial;

(d) Target was followed by various analysts employed by major Wall Street brokerage firms, who wrote reports which were distributed to the sales force and certain customers of the brokerage firms and which were available to various automated data retrieval services; and

(e) The market price of Target securities reacted efficiently to new information entering the market.

279. The foregoing facts demonstrate the existence of an efficient market for trading of Target securities and support application of the fraud-on-the-market theory.

280. Plaintiff relied on the integrity of the market price for the buying and holding of his securities and is entitled to a presumption of reliance with respect to the Defendants' misstatements and omissions alleged in this Complaint.

281. Had Plaintiff known of the material adverse information not disclosed by the defendants, or been aware of the truth behind the defendants' material misstatements, Plaintiff would not have engaged in the buying or holding of his securities detailed herein to buy and hold his securities at artificially inflated prices.

## VII. The Private Securities Litigation Reform Act Safe Harbor Is Inapplicable.

282. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made. Rather, the false or misleading statements complained of in this Complaint concerned

historical and/or current facts and conditions existing at the time the statements were made.

283. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

284. Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Target or by a Director Defendant who knew that the statement was materially false or misleading when made.

## CLAIMS FOR RELIEF

### Count One
### (Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

285. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 284 as if fully set forth herein.

286. Plaintiff brings this claim as a direct claim against Target and the Director Defendants for violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

287. Rule 14a-9 (17 C.F.R § 240.14a-9), promulgated under § 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

288. When Plaintiff purchased the stock and throughout the period of his ownership, the Defendants disseminated the false and misleading 2022 Proxy and 2023 Proxy, which made false and misleading statements of material facts and which failed to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

289. As a result of the Defendants' preparation, review, and dissemination of the 2022 Proxy and 2023 Proxy, Plaintiff has suffered substantial harm.

290. Because of such misconduct, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and Rule 14a-9.

**Count Two**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

291. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 284 as if fully set forth herein.

292. Plaintiff brings this claim as a direct claim against Target and the Director Defendants for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

293. Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under Section 10(b) of the Exchange Act, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

294. When Plaintiff purchased the stock and throughout the period of his ownership, the Defendants disseminated to investors the false and misleading 2022 Proxy and 2023 Proxy, which Defendants had actual or constructive knowledge that each made false and misleading statements of material facts and which failed to state material facts necessary to make the statements that were made not misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

295. As a result of the Defendants' preparation, review, and dissemination of the 2022 Proxy and 2023 Proxy, Plaintiff has suffered substantial harm. By reason of such misconduct, the Defendants are liable pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.

**Count Three**
**(Violations of Section 20(a) of the Exchange Act Against the Director Defendants)**

296. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 284 as if fully set forth herein.

297. During the period Plaintiff owned Target stock, the Director Defendants had and exercised the power to control the general affairs of Target, participated in the management and operation of Target, and conducted and participated, directly and indirectly, in the conduct of Target's business affairs. Because of their senior positions, they knew the adverse non-public information about the development of the LGBT-Pride Campaign and the Board's failure to oversee it, and the social and political risks Target's proxy statements proclaimed the Board oversaw.

298. As directors and, with respect to Defendant Cornell, as CEO of a publicly owned company, the Director Defendants had a duty to disseminate accurate and truthful information with respect to Target's governance and operations, and to correct promptly any public statements issued by Target which were or had become materially false or misleading.

299. Because of their positions of control and authority as directors and senior officer, the Director Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Target disseminated in the marketplace during the Plaintiff's period of ownership. Throughout that period, the Director Defendants exercised their power and authority to cause Target to engage in the loss-causing acts complained of herein.

300. The Director Defendants, therefore, were "controlling persons" of Target within the meaning of Section 20(a) of the Exchange Act.

301. In this capacity, they participated in the conduct alleged which artificially inflated the market price of Target securities.

302. Each of the Director Defendants, therefore, acted as a controlling person of Target. Each of the Director Defendants had the power to direct the actions of, and exercised the same to cause, Target to engage in the unlawful acts and conduct complained of herein.

303. Each of the Director Defendants exercised control over the general operations of Target and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

304. Because of the above conduct, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Target.

## REQUEST FOR RELIEF

Plaintiff requests that this Court provide the following relief:

**A. A declaration that Defendants violated Section 14(a) and Section 10(b) of the Exchange Act;**

**B. A declaration that Target's 2023 director election was void;**

**C. An order awarding to Plaintiff the damages he has sustained as a result of the violations set forth above from each Defendant, jointly and severally; and**

**D. Such other and further relief as the Court deems just and proper, including reasonable attorney's fees and costs.**

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 8, 2023

Respectfully submitted,

/s/ Jonathan Berry
JONATHAN BERRY (*pro hac vice* forthcoming)
*LEAD COUNSEL*
R. TRENT MCCOTTER (*pro hac vice* forthcoming)
Boyden Gray PLLC
801 17th St NW, #350
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

GENE P. HAMILTON (*pro hac vice* forthcoming)
REED D. RUBINSTEIN (*pro hac vice* forthcoming)
America First Legal Foundation
611 Pennsylvania Avenue S.E.
No. 231
Washington, D.C. 20003
(202) 964-3721
gene.hamilton@aflegal.org

JASON B. GONZALEZ (FBN: 146854)
PAUL C. HUCK, JR. (FBN: 968358)
SAMUEL J. SALARIO, JR.
(FBN: 083460)
Lawson Huck Gonzalez, PLLC
215 S. Monroe Street, Suite 320
Tallahassee, FL. 32301
(850) 825-4334
jason@lawsonhuckgonzalez.com

*Counsel for Plaintiff*